Good morning. May it please the Court, my name is Kari Hong and I represent petitioner Edwin Tessera Ramirez. The BIA committed four notable errors. First, the BIA erred in claiming that family members of journalists do not meet the social visibility requirement to constitute a particular social group. Since the BIA's decision, both the BIA and the Ninth Circuit have more clearly defined this issue and held that social visibility is not as limited as the BIA had understood when it was deciding this case. Counsel, before we get to that and the nexus issue that relates to that, I want to be sure I understand the asylum issue. Correct me if I'm wrong on any of these factors. I understand that Mr. Ramirez was 17 years old when he came to the country, is that right? Yes, Your Honor. And he takes the position he doesn't remember whether he signed the asylum application or not, is that correct? I cannot recall that specific point. I think so, yes. Okay, so I guess I kind of need to know which way it is. If he didn't sign it, then you've got the one-year bar. If he did sign it, you have a fraudulent application. Since he has the burden, doesn't he have to make an election which way he's going to go? That wasn't an issue it wasn't objected to by the DHS. The IJ didn't find that problem. The BIA didn't find the problem. The government didn't find that problem before the court. There's a credibility finding in his favor? Yes, Your Honor. And in credibility and finding in the favor of his brother. Also, when he learned about the fraudulent application, he immediately corrected it. Isn't that correct? Yes, Your Honor. And again, the IJ, I would contend, washed over it by finding him credible. Further, there was in 2007, when the DHS initiated removal proceedings, he filed an amended and revised asylum application, which is what the judge proceeded with. So turning back to that particular case, in both Enriquez-Rivas and Pierre Bach, the cases cited in the Rule 20HA letters, this court has recognized that gangs who target specific individuals may form a cognizable group. For instance, in Pierre Bach, this court remanded the case when the BIA failed to look at whether the particular social group existed as defined through the context of the specific country at issue. Here, there are country condition reports showing that family members of journalists are being targeted and killed by gangs. The difficulty I have is, you know, the social visibility, as you know, is a little bit amorphous and it's had some new legs over time. But even if you would assume, as BIA did, that you could pass that threshold, where's the evidence that the harm was on account of the association? And then that goes to the second issue about the BIA unduly limiting the credibility finding. What's significant is that the BIA found there was, quote, no evidence of harm against the mother and harm against Mr. Ramirez. This was air because the IJ had found both Ramirez and the brother testimony. And the brother testified that both he and his mother had been targeted by gangs for retaliation of his activities. Where's the persecution of your client, Mr. Ramirez? If we assume, for purposes of our discussion, that there is a journalist category, as you very well know as an experienced immigration practitioner, usually when you find past persecution, it has to be of the applying individual. You have to cite instances where they were persecuted. Show me in the record where your client personally was persecuted. Not harassed, not insulted or whatever. Show me where he was persecuted. Where in the record? And, Your Honor, this claim is based on well-founded fear. There is no past persecution of Mr. Ramirez. Under sale and HACSA. So you're saying that this is strictly based upon future persecution. You're not in any way claiming past persecution? Yes, Your Honor. For Mr. Ramirez, he was out of the country beginning in 2005, 2006, 2007 and 2008 and 2009 when all the attacks against journalists have been happening. So it was impossible for him to be the target of persecution in the way that his brother is and the way that his mother has been. What about his mother? Let's focus on that. Much of the testimony there to me reads like many cases we see where it's money extortion and not necessarily linked to political or some other statutory basis. So on that point, what in the record compels a finding that the mother's extortion or alleged persecution was on account of one of those categories? Your Honor, I would submit it's very similar to the Singh case, which is also subject to the Rule 28J letter. In that case, mixed motive is recognized, and the mixed motive doctrine was not as developed before the BIA case as it is here. So even though the gang members who identified themselves as gang members, this was what the brother testified to, and that was not in dispute by the government recitation either, that even though they targeted her for extortion, they were also targeting her because she was the mother of Domingo. That was in his testimony when he was expressly asked, why would people have any interest in your mother? Quote, well, because of her name, Elisa Ramirez-Terso. And so the name Tesero is always associated with her. I believe it would be due to that reason. And since those military people recruited gang members, it's easy for them to mobilize people and to commit crimes. That's at the record at 113. What is significant is that the IJ rejected this in his finding at page 82, because it didn't have the magic words that the gang said, we are targeting you because you are Domingo's mother. Under LADA, this court requires that both facts and inferences have to be taken into account when there's a credibility finding and, in this instance, corroborating country conditional reports that clearly show that journalists and the family members are being targeted. So the problem at issue is that the IJ had a much too... At that point, do you have to get past the hurdle of families of journalists being this socially acceptable or socially identifiable group? Yes, Your Honor. That would have to be the first step to recognize. And under the changes of a particular social group, we believe that we now make that, especially in the Pereira-Bach case that was decided last week. And then at the second level, when the BI said there was no evidence, in part because it didn't recognize the group to even look at the record to see what supported it. Once it recognizes and has the proper group in front of it, and when it applies the inferences along with the facts, it will make the link that the mother was harmed because of her association with Domingo. But then that raises kind of an interesting evidentiary question. The IJ or BIA on appeal is bound to make these inferences. But how do you square that general proposition of you have to take the inferences that you can get from the credible facts with the legal standard that the evidence has to compel in order to overturn the determination of the BIA? This record is very advantageous for that question because the BIA expressly refers to the IJ's findings in reaching its own factual findings. And the IJ decision at 82 goes through a recitation that he makes it very clear he is rejecting inferences. He's rejecting opinions, deductions, and conclusions. I'm sorry, this is at 76, that the credible testimony is linking to. Because the IJ unduly limited the credibility finding. The BIA did not, and the BIA expressly incorporated that unduly limiting finding. That is the erroneous error that then would compel reversal, both for the legal error and not just the. I'd like to ask a question before your time is up. Recently, in my experience, we have referred cases for mediation when there are very strong equities involved. Assuming without deciding that the panel would do that, what would be the equities in your client's favor? Your Honor, actually, since this case, in March he married a USC citizen. He had a child with this woman who's now 3 years old. He has a second child who's due in the fall of this year, a USC citizen. He's adopting this woman's child from a prior relationship who's 5 years old because the father's out of the picture and he's been raising her since he was 8 years old. He had a criminal record that's in the record, but for the past 12 years, he's had zero contact with law enforcement. All of his family members are here in the United States and all but one, who's also a client of mine, has legal status and he's in the process of getting legal status of either becoming a green card member or citizen. So he's an enormous length of residence, significant family ties, a growing family that he has in the United States that definitely compel that. Can you help me with this? I didn't see in the record that he had married. When did he marry? In March of this year. March of this year. Where's that in the record? Oh, it's not, but in terms of... You say he has a child of this relationship? Yes, Your Honor. I have the birth certificate. I can provide it to the court, but in response to Judge Nelson's... I'll take your representation, but he came here at 17, he married at 38, right? Yes, Your Honor. Okay, in March of this year. He has, what, five brothers here, something like that, and their families? Yes, and he's been with that woman for five years. They just didn't marry until this year. I understand. And where does his mother live? She is still in Guatemala with his oldest brother and sister, the other five siblings. And has she been personally directly harmed, physically harmed? Only through the death threats that are in the record. And has the brother been physically harmed other than what's shown in the record? Only the four incidents that he recites in the record. Okay. Any other family members that have been harmed? No, because only the sister is the one who is in there. Well, as a result of the marriage, would he be eligible to file some kind of motion to reopen or some other procedural effort to have his case deferred and looked at through another avenue? He could file an I-130, and the USCIS has amended the I-12, I-212 waivers that would allow him to waive the unlawful presence. So he could receive the I-45, an adjustment, if the Court deems that mediation is a proper resolution. Thank you. Good morning, Your Honors, and may it please the Court. Michael Heiss on behalf of the Respondent, the Attorney General of the United States. As an initial matter, based on the discussion towards the end there regarding mediation, the parties discussed that, actually leading up to this argument today. Could I ask you one preliminary question? Is there anything in the record to show why it took the government 13 years to act on the 1993 asylum claim? Your Honor, that's actually something that has happened frequently, especially in cases involving Guatemala, El Salvador, Honduras, based on the situation that was there. Apparently DHS, or I guess at the time it was the INS, just did not process a lot of these applications. But you can see that at the time the application was made, he would have been entitled to asylum. Well, based on his application that he made at the time that he is since devoured, that's essentially impossible to say. But also it's worth pointing out that he enjoyed the benefit of being here that entire time without being subject to removal. So it bothers me. It seems fundamentally unfair. I'm assuming now that because of the situation in his country, he was in danger at that time, but country conditions have changed. Isn't it sort of fundamentally unfair for the government to fail to process until the country conditions change? Well, first of all, Your Honor, I'm not sure the record establishes that he certainly would have been eligible at the time. Again, his application, he's since disavowed it, so I'm not sure if Your Honor is basing his present claim but setting it in the context of a 1992-1993 timeframe. 1993. 1993 timeframe. So based on his being the family member of a journalist, this record, if I'm understanding what Your Honor is saying, you believe this record would support his eligibility for removal, relief, or protection? Mm-hmm. Okay. The government position disagrees with that. While opposing counsel has repeatedly stated that the country reports show that family members of journalists are targeted, we've never been provided with a citation to the record that shows that. All of the articles that were cited by the petitioner or provided by the petitioner talk about how journalists are indeed in danger. And there's really no one disputing that. The immigration judge pointed out that the brother probably would have a decent claim. Didn't say he would prevail, but he'd probably have a better shot than his brother. But the question was, how does the benefit of asylum, the protection of asylum, extend to the family? How far does that go? And nothing, nothing in the record establishes that. The name Tercero is the one at issue, and I believe there's this so-called blacklist that is referenced in the record. Yes, Your Honor. And that included, I believe, the mother and the brother and perhaps another family member. Is there a reasonable inference to be drawn from that with respect to extending the journalist threat to the family? Well, again, that's an inference. And as Your Honor was pointing out earlier, this Court is reviewing this case under the substantial evidence standard overview. And while the record could perhaps maybe reach some other result, it has to be compelled, the Court has to be compelled to reach this other result. No reasonable fact finder could find otherwise. And while there is this, supposedly there is this blacklist, again, that was not submitted in the record. It was discussed. And opposing counsel, again, is emphasizing that her client was found credible and his brother was found credible. But that only goes to the subjective value of what they're saying. The substantial evidence standard overview and asylum in general requires a two-part inquiry. It's both a subjective inquiry, but also it must be objectively reasonable. The fear must, the record must establish that his fear is objectively reasonable. And again, these articles that are cited, several of them reference how journalists themselves are subject to harm. The brother was shot, things like that. That makes sense, that that potentially could be an asylum claim. But to extend that out to the brother with nothing in the record that supports that family members are indeed targeted. Could I ask you to go back? We waylaid you a little bit. That's okay. You got up and you were about to talk about what you had discussed. I'm used to that, Your Honor. And then we went off on some additional facts and issues. So would you go back to whether the parties have agreed perhaps that they, in light of the change of circumstance, that there should be perhaps mediation or referral to at least an assessment for mediation? Yes. We have had discussions with DHS about recommending PD in the prosecutorial discretion, I should say, in this matter. And they declined to exercise prosecutorial discretion. So let me be sure I understand. So basically, in effect, you have done an assessment and the government has declined to exercise prosecutorial discretion to not proceed with this case. Is that correct? That's correct. Okay. Yes. May I ask one more question? Putting the journalists aside, as of 1993, wasn't there in the record a showing Guatemala's well-documented campaign against indigenous Guatemalans? Is that correct? Could you repeat the question, Your Honor? In the country reports, it showed that the Guatemalan government had a distinct campaign against indigenous Guatemalans. Am I correct on that? That, as far as I know on this record, is not presented here. His claim, again, as an indigenous Guatemalan has not been exhausted at all before the agency. If the Court is concerned about the basis of that claim, given the timing of his application, that's a, I suppose, a possible avenue for remand. But given the substantial change in country conditions since then, and given that asylum is intended to be forward-looking, that would be a futile remand. Where do we look at the timeframe for this application? Because we have a disavowed application, correct? Correct. And what is the timing of, I guess, what I'll call the current application? What is the year on that? I believe that was filed in 2004. So this is actually a pre-real ID case as well. Pre-real ID. Correct. Post-Guatemala war. Right. A lot has changed. But, again, Mr. Ramirez benefited from being able to remain here in the United States for over two decades now. Let me understand that. This was filed in 19, I'm sorry, 2004. I'll call it the fraudulent application was filed in what, 92? 93. Something like that. If he disavows that, there's a one-year statute for the filing of an asylum application. On what basis did he file in 2004? Was it an amendment to the fraudulent application? Was it a new application? What was it? I tried to figure that out myself, Your Honor, from the record. And it's essentially, I think it's basically an acknowledgement of the delay to allow him to file an application. But you can't amend a fraudulent application, can you, where the petitioner himself, number one, doesn't acknowledge he signed it, and number two, he says that everything in it is false. So you can't amend that, right? I believe an individual can, actually. That's an individual's novel concept. Well, if he was misled, if he received bad advice, for example. I'm not sure that's what happened in this case. Well, doesn't that happen all the time? There's sometimes notarios. Exactly, Your Honor. Without the guy, he doesn't even know what it says. Exactly. They haven't translated it into Spanish. I personally handled a case before this Court where the individual signed a blank application because he was simply told to do so in the court. Because it wouldn't be fraudulent then, right? One would think. That's the thing. He doesn't even acknowledge that he signed it. I believe he did indicate that he signed it. Can you recall? I thought your opposing counsel said that he did not, or you took no position as to whether he did or he didn't. Again, I believe ultimately the question here is did the government object? Did the ---- Which the government did not, right? No. So any procedural deficiencies in this application have been waived by the government, is that correct? Correct, Your Honor. We're not contesting the timeliness. And I believe that's something within the ---- Is that then from the government's perspective what we're handling here is the amended asylum application? The 2004 application, yes. Okay. That basis alone. Okay. And your position on the journalist group is there's no nexus and there's no compelling requirement there, and therefore we don't get to that from your perspective. Precisely, Your Honor. I mean, there's obviously a question of the particular social group and the different standards that have changed since this case was decided in 2011. There's Enriquez-Rivas, and now more recently, Pereira-Bach. Social visibility is now social distinction, which this Court has recognized as an acceptable basically continuation of Enriquez-Rivas. But ultimately, even assuming we have a social group of family members of journalists and we don't here, there's simply nothing in the record to make the connection between that social group and the harm that he claims to fear. There's no suggestion to the group itself that Guatemalan society recognizes them as a group. The nexus issue. If you're at liberty to do so, can you walk the Court through the reasoning of the government in rejecting an assessment for some type of settlement based on prosecutorial discretion? And this is very fresh, Your Honor. I got this this morning from the Seattle DHS office that handled this case. This is out of Portland, and Seattle handles Portland. Right. I believe it was based on his conviction record. Okay. So that's the DUI, right? He has a DUI. He had a- Twelve years ago, right? The DUI was 12 years ago. The DUI was, I believe, 1992, so actually more than that. And there's been nothing else on his record since that time? He had a, it was a failure to properly operate his vehicle. A traffic ticket was the DUI. But all of those are old. That's in addition to the DUI. Yeah, but that also is old. He's had multiple contacts with the criminal system. Excuse me. Would you explain that? You just said he had multiple contacts with the criminal system. Would you show me the record where that appears? Well, PD, Your Honor, goes beyond the record. Looking to, for example, his marriage in March, we're dealing with a case that was decided in 2011. He was married two months ago. So those records have, all of that was submitted to, a package was submitted to Seattle for their consideration. So let me make sure I understand that opposing counsel provided, and your office provided to Seattle, all of the current information available,  Yes, Your Honor. notwithstanding that the government has determined that it's not interested in, well, you've assessed it, basically. Correct. But you're not interested in going forward with mediation. That is absolutely correct, Your Honor. Based upon contacts with the law system. Okay. Correct, Your Honor. I'm well over my time, so the Court has no further questions. Thank you, Your Honor. Your Honor, excuse me. I think that you've used your time, but we gave him a little extra. Would you put it in there? Thank you, Your Honor. On the first issue, opposing counsel said that he, there is nothing in the record to show about harm to family. Page 178, a journalist that's under threat, and the organization protecting him says, quote, we call for a rapid review of the protection for his family and himself. That's 178. But that doesn't say that the family members had been harmed, right? But they are in danger, which is the well-founded fear. The position you take. Yes. I think the government's point was that the articles that are cited talk about danger to the journalists. They don't show, if I recall correctly, they don't show that family members of journalists have actually been harmed. Is that correct? 181, the journalist's brother, who is also correspondent, was shot to death in September 2006. That's 181. Based upon his brother being a journalist? We're not sure, but that inference is there. And then 177 to 197, what's unique about this harm, it includes home invasions, attacks in the person's home, not in the public sphere. The second, the government said there was no evidence of the CIA report. That's 197. The documentation, that's 70 to 80 million documents that the military had were disclosed, and that's where Mr. Tercero and his family were listed. And third, in past instances, when the government has not settled cases, I have found that the court's referral to mediation has been the extra leverage needed to communicate to the government that the decision warrants a second review, and I have been successful in mediation when settlement has not been reached before. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. The case just argued of Tercero v. Holder is submitted.
judges: Nelson, McKeown, Smith